**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Donatelle Plastics Incorporated,

Plaintiff,

v.

Stonhard, Inc., n/k/a StonCor Group, Inc.,
a Delaware corporation,

Defendant.

Civ. No. 01-1429 (RHK/AJB)
**MEMORANDUM OPINION AND ORDER**

---

William L. Killion, Bradley R. Johnson, and Brian L. McMahon, Gray, Plant, Mooty, Mooty & Bennett, Minneapolis, Minnesota, 55402, for Plaintiff.

James M. Lockhart and Geraint D. Powell, Lommen, Nelson, Cole & Stageberg, Minneapolis, Minnesota, 55402, for Defendant.

---

This matter arises out of Defendant Stonhard, Inc.'s (now known as StonCor Group, Inc.) (hereinafter "StonCor") manufacture and installation of an epoxy resinous flooring product at a new office/manufacturing facility that Plaintiff Donatelle Plastics, Inc. ("Donatelle") was building in New Brighton, Minnesota. Donatelle complains that, after installation, the flooring failed to adhere to the concrete substrate, peeled, delaminated, cracked at control joints, and discolored. Donatelle has asserted claims against StonCor for breach of contract, breach of express and implied warranties, negligence, strict liability, common law fraud, and violations of Minnesota's Deceptive Trade Practices Act, False Statements in Advertising Act, and Consumer Fraud Act.



SEP 0 5 2002
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

Before the Court is StonCor's summary judgment motion, seeking dismissal of all of Donatelle's claims on the grounds that they are barred by Minnesota's two-year statute of limitations for improvements to real property. StonCor alternatively seeks summary judgment on Donatelle's negligence and strict liability claims based on the application of the "economic loss doctrine" and summary judgment on the common law and statutory fraud claims on the grounds that Donatelle cannot establish an essential element of those causes of action. Finally, StonCor moves to limit the damages recoverable by Donatelle on any breach of warranty action, excluding any recovery for consequential damages, incidental damages, and damages arising from lost profits.

**Background**

## I. StonCor Bids to Make and Install Flooring at Donatelle's New Building

Donatelle manufactures precision plastic products, including components used in the manufacture of health care products. (C. Donatelle Aff. ¶¶ 4, 7.) In 1997, it was planning the construction of a new manufacturing and office facility on part of a former Superfund site in New Brighton.[1] (Powell Aff., Ex. 4 at BIC000108 (March 6, 1998 letter from Braun Intertec to Charles Donatelle).)

StonCor manufactures and installs resinous flooring systems for use in commercial

[1] The architect for Donatelle's new facility was Norm Wells Architect, P.A. Braun Intertec Corporation provided some engineering and evaluation services related to the project. The general contractor for the facility was Adolfson & Peterson, Inc., and the job site supervisor was Al Martinson. (Powell Aff. Ex. 6 at 3-4 (Pl.'s Responses to Def.'s First Set of Interrogs.).)

and industrial applications. (Am. Compl. ¶ 2, Answer ¶ 3.) In September 1998, StonCor provided Donatelle with a proposal notebook entitled "Turn-Key Proposal for Resinous Flooring." The proposal book contained two letters, each dated September 11, 1999. (C. Donatelle Aff. ¶ 13.) The first letter described the six main sections of the proposal book. (See Powell Aff. Ex. 7 (Sept. 11, 1998 letter from Schaller to Phillipsen).) In that book, StonCor stated that it performs, as part of its turn-key proposal, a "site condition survey," including a review of traffic conditions, chemical exposure, and maintenance procedures. (C. Donatelle Aff. ¶ 22 & Ex. 4.) StonCor also stated that, as part of its turn-key proposal, it tests the concrete, chemicals, and adhesion of the flooring to the substrate. (Id.)

The second September 11 letter in the proposal book, addressed to John Phillipsen at Donatelle, was from Michael Schaller, a project engineer for StonCor. This letter provided details of StonCor's bid "to furnish and install resinous flooring for Donatelle Plastics' new facility" (hereinafter the "September 11 bid letter"). (Powell Aff. Ex. 7; Powell Aff. Ex. 9 at DPI00016 (Sept. 11, 1998 Letter from Schaller to Phillipsen).) StonCor offered to furnish and install "Stonshield SLT (double seal)" flooring that would cover 27,100 square feet in three areas of the facility: Production, Second Operation, and Tool Room. StonCor quoted a price of $2.90 per square foot for furnishing and installing the floor, resulting in a bid for the project of $78,590.00. (Id.) StonCor described the scope of the work it would perform as follows:

- Mechanically prepare substrate with steel shot blast equipment.
- Key chase all floor transition points to increase strength.
- Pre-fill any cracks or holes in the substrate.
- Apply Standard Primer to establish chemical bonding of overlayment and air broadcast the color quartz aggregate, Stonshield SLT, into the primer.
- Apply clear epoxy undercoat and air broadcast Stonshield SLT.
- After cure, remove loose aggregate and apply clear high performance epoxy sealer to lock in the aggregate.
- Apply an additional sealer to give a smother surface.
- Sawcut all control joints and fill with Stonflex MP7, an elastomeric joint sealant

(Id.) The September 11 bid letter also described StonCor's warranty, stating that StonCor would

> provide a single source five (5) year warranty covering all labor and materials. This includes:
> - Adhesion of the flooring system to the concrete substrate.
> - Integrity of the system – blistering, delamination, or peeling.
> - Cracking of the flooring system at control joints.
> - Chemical resistance per the product data provided.
> - Temperature stability per the product data provided.

(Id.) Finally, a section of the September 11 bid letter entitled "Clarifications" stated that StonCor's proposal was "based upon Donatelle Plastics' acceptance of the enclosed General Terms and Conditions." (Id. at DPI00017.) The first two paragraphs of the General Terms and Conditions list certain responsibilities of StonCor and of the customer.[2] (Id. at DPI00018.) Thus, it was StonCor's responsibility to

---

[2] Paragraph 6 of the General Terms and Conditions states that "[t]his Agreement shall be governed by and construed in accordance with the laws of the State of New Jersey." (Id. at DPI00019.) Paragraph 7 of the General Terms and Conditions is an integration clause, stating that "[t]his Agreement shall constitute the entire Agreement

> visually inspect[] the project site prior to the commencement of work and agree[] to the contract based on the existing nature of the project site as it appears and is represented by the Customer. In the event that concealed conditions are revealed which would materially change the nature of the contract work, [StonCor] is entitled to cease work until such time as the contract sum has been adjusted equitably to compensate for such change.

(Id.) According to the General Terms and Conditions, the customer (Donatelle) was responsible for "investigat[ing] the project site prior to the commencement of work and represent[ing] that the existing nature and conditions of the project site is as it appears and that there are no other concealed conditions which would materially change the nature of the contract work." (Id.)

## II. Donatelle Responds to StonCor's Bid

Donatelle sent a Purchase Order dated December 7, 1998, to StonCor for Stonshield SLT flooring to be installed in the Production, Second Operation and Tool Room areas of the new building. (Powell Aff. Ex. 9 at DPI00021-22 (Donatelle Purchase Order to StonCor).) Charles Donatelle stated that the company decided to use epoxy flooring in the new building because they liked the look of the product, particularly the absence of any seams. (C. Donatelle Aff. ¶ 11.) Mr. Donatelle also believed that having an attractive, seamless floor in the manufacturing area was important for the company's marketing efforts. (Id.)

The Purchase Order stated that it had "been generated per letter dated September

---

between the parties and the parties acknowledge that there are no other verbal or written Agreements, understandings or customs affecting the Agreement." (Id.)

11, 1998 to Attn: John Phillipsen." (Id. at DPI00023.) The Purchase Order repeated verbatim the "Scope of Work" section from StonCor's September 11 bid letter and identified the color for the floor. (Powell Aff. Ex. 9 at DPI00021-22.) It also provided that StonCor's warranty was "a single source five year warranty covering all labor and materials." (Id. at DPI00022-23.) The Purchase Order did not repeat the "Clarifications" section from the September 11 bid letter or explicitly reference the General Terms and Conditions. (Id.) On the Purchase Order, Cindy Rue, the buyer for Donatelle, asked Schaller to confirm price and delivery information. (Id. at DPI00021.)

## III. The Flooring is Installed at Donatelle's Facility

In January 1999, StonCor manufactured, sold, delivered, installed, and supervised the installation of the Stonshield SLT flooring at Donatelle's facility in New Brighton. (Am. Compl. ¶ 13; Answer ¶ 9.) On January 14, Charles and Mike Donatelle reviewed the installation of the floor with the general contractor's site representative and Schaller from StonCor; they refused to accept StonCor's work as complete, requiring StonCor to redo a number of areas. (Donatelle Aff. ¶ 37.)

## IV. Donatelle Complains to StonCor about the Flooring

In late January 1999, Donatelle reported to StonCor that there was a problem with the floor in the Tool Room; it was delaminating next to a wall. (Powell Aff. Ex. 6 at 13 (Pl.'s Responses to Def.'s First Set of Interrogs.); see also Am. Compl. ¶ 14 and Answer ¶ 10.) StonCor promised to repair that problem and arranged for its repair within two

weeks. (Powell Aff. Ex. 6 at 13.) Donatelle also noticed problems with the flooring at the joints in the Tool Room. (Id.) Donatelle showed those problems to Schaller. (Id.) By a letter dated February 3, 1999, Schaller wrote to Donatelle, advising that "control joints should be cut at the isolation points." (Donatelle Aff. ¶ 41.)

In May 1999, Donatelle reported to StonCor that the floor was cracking and delaminating around the joints in the injection molding production room. (Powell Aff. Ex. 6 at 13.) On June 12, 1999, a StonCor crew came out to repair areas that were coming loose. (Id.; see also Am. Compl. ¶ 15; Answer ¶ 11.) The following day, Schaller went to the Donatelle facility; he stopped the work the crew was doing because he was not satisfied with the way the repairs were proceeding. (Am. Compl. ¶ 16; Answer ¶ 12; Powell Aff. Ex. 6 at 13.)

On July 16, 1999, Schaller sent a letter to Donatelle, following a meeting the previous week, in which Schaller affirmed that it was StonCor's "goal to provide Donatelle Plastics with a dependable, long lasting floor system." (Donatelle Aff. Ex. 14.) Specifically, StonCor promised to take several steps to ensure satisfactory results, including the removal of unbonded floor along joints, marking all joints and pre-filling areas with a sealer-aggregate mix, surface sanding the entire area, and broadcasting one millimeter of the SLT system. (Id.)

Between August 21 and 23, 1999, StonCor sent another crew to Donatelle's facility to complete the repairs described in Schaller's July 16 letter. (Powell Aff. Ex. 6

at 13.) At that time, the crew discovered that the flooring had come loose in a large part of the Production Area. (Id.) They removed that loose flooring with ice scrapers, further bead-blasted the concrete substrate, and reinstalled the flooring.[3] (Id.)

During the August repairs, Donatelle noticed that portions of the floor by the east wall of the facility had begun to discolor; Donatelle requested repairs from StonCor. (Id. at 13-14.) Between September 9 and 12, 1999, a StonCor crew worked to repair the floor by re-broadcasting a layer of flooring on top of the original flooring and then applying a topcoat of some sort. (Id. at 14.) Later, the yellowish discoloration returned. (Id.)

From September through November 1999, Donatelle and Schaller further discussed repairing the floor. Schaller acknowledged that there were problems with the installation of the floor and indicated that StonCor wanted to repair it. (Id.) In November 1999, however, StonCor took the position that the problems with the flooring could be attributable to moisture transmission, and tried to sell Donatelle a new floor. (Id.)

On December 3, 1999, StonCor's District Sales Manager, John Wafford, sent a letter to Donatelle enclosing StonCor's test results from core samples taken at the facility on or about November 19. (Am. Compl. ¶ 90; Answer ¶ 56.) Those results purportedly showed an average moisture emission of 5.74 pounds per 1,000 square feet per twenty-four hour period, an emission rate that is almost double the emission limits for the

---

[3] While the new flooring apparently adhered to the substrate, it has yellowed in some areas, like other portions of the floor. (Id. at 17-18.)

Stonshield SLT flooring product. (Id.) In his December 3 letter, Wafford indicated that the results of the emission test, combined with a better than average bond strength, suggested that moisture emission from the concrete was a significant cause of the delamination of the floor. (Id.)

Donatelle commenced this lawsuit on July 18, 2001 in state court. It was timely removed from Hennepin County District Court to this Court. This Court has subject matter jurisdiction based on diversity of citizenship: Donatelle is a Minnesota corporation and StonCor is a Delaware corporation with its principal place of business in New Jersey.

## Analysis

### I. Standard of Decision

Summary judgment is proper if, viewing the record in the light most favorable to the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that the material facts in the case are undisputed. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). The court must view the evidence, and the inferences which may be reasonably drawn from it, in the light most favorable to the nonmoving party. See Graves v. Arkansas Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997).

If the party with the burden of proof at trial is unable to present evidence to

> establish an essential element of that party's claim, summary judgment on the claim is appropriate because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."

St. Jude Med., Inc. v. Lifecare Int'l., Inc., 250 F.3d 587, 595 (8th Cir. 2001) (quoting Celotex, 477 U.S. at 323 (1986)).

The nonmoving party may not rest on mere allegations or denials, but rather must demonstrate the existence of specific facts that create a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995). The court does not weigh facts or evaluate the credibility of affidavits and other evidence on a motion for summary judgment. See Liberty Lobby, 477 U.S. at 249. The nonmovant, however, cannot avoid summary judgment in favor of the movant merely by pointing to some alleged factual dispute between the parties. Instead, any fact alleged to be in dispute must be "outcome determinative under prevailing law," that is, it must be material to an essential element of the specific theory of recovery at issue. See Dancy v. Hyster Co., 127 F.3d 649, 652 (8th Cir. 1997); Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992).

## II. Statute of Limitations

On summary judgment, StonCor argues that Minnesota's two-year statute of limitations on actions for damages based on services or construction to improve real

property, Minn. Stat. § 541.051, precludes all of Donatelle's claims.[4] Section 541.051 provides, in pertinent part,

> Subdivision 1 (a) Except where fraud is involved, ***no action by any person in contract, tort, or otherwise to recover damages for any injury to property, real or personal***, or for bodily injury or wrongful death, ***arising out of the defective and unsafe condition of an improvement to real property***, nor any action for contribution or indemnity for damages sustained on account of the injury, ***shall be brought against any person performing or furnishing the design, planning, supervision, materials, or observation of construction or construction of the improvement to real property*** or against the owner of the real property ***more than two years after discovery of the injury*** or, in the case of an action for contribution or indemnity, accrual of the cause of action, nor, in any event shall such a cause of action accrue more than ten years after substantial completion of the construction. Date of substantial completion shall be determined by the date when construction is sufficiently completed so that the owner or the owner's representative can occupy or use the improvement for the intended purpose.
>
> (b) ***For purposes of paragraph (a), a cause of action accrues upon discovery of the injury*** or, in the case of an action for contribution or indemnity, upon payment of a final judgment, arbitration award, or settlement arising out of the defective and unsafe condition.
>
> *****

[4] The General Terms and Conditions provide that the parties' Agreement shall be governed by and construed in accordance with New Jersey law. Minnesota courts are committed to honoring an agreement, entered into by parties to a contract in good faith, to have the law of another jurisdiction govern their contractual relationship. Milliken & Co. v. Eagle Packaging Co., 295 N.W.2d 377, 380 n.1 (Minn. 1980). It is also, however, the rule of law in Minnesota that statutes of limitation relate to the remedy and are therefore governed by the law of the forum. American Mut. Liab. Ins. Co. v. Reed Cleaners, 265 Minn. 503, 507 n.1, 122 N.W.2d 178, 181 n.1 (1963). Thus, Minnesota courts closely examine a contractual choice of law provision to determine whether the parties expressly agreed to the application of a particular jurisdiction's law with respect to remedies. See United States Leasing Corp. v. Biba Info. Processing Servs. Inc., 436 N.W.2d 823, 825-26 (Minn. Ct. App. 1989). The parties do not contend that they intended to have New Jersey law apply as to remedies. The Court concludes Minnesota law applies.

> Subdivision 4. ***This section shall not apply to*** actions based on breach of the statutory warranties set forth in section 327A.02, or to ***actions based on breach of an express written warranty, provided such actions shall be brought within two years of the discovery of the breach.***

Minn. Stat. § 541.051, subds. 1(a), (b), & 4 (emphasis added). If section 541.051 does not apply, Minnesota's general statute of limitations provides for a six-year limitation for actions upon express or implied contract, statutory liabilities, trespass, and injury to personal property, and a four-year limit for strict liability. Minn. Stat. § 541.05 (2000).

Failure to bring an action within the period prescribed by the statute of limitations is an affirmative defense, and StonCor bears the burden of proving all the elements of that affirmative defense. See Thiele v. Stich, 425 N.W.2d 580, 583 (Minn. 1988); Ritchey v. Horner, 244 F.3d 635, 639 (8th Cir. 2001). To benefit from the limitations defense, StonCor must establish the following three elements: (1) StonCor "perform[ed] or furnish[ed] the design, planning, supervision, materials, or observation of construction or construction of the improvement to real property" at issue; (2) Donatelle's claim arises out of a "defective and unsafe condition" of the improvement; and (3) the condition of the improvement is the cause of the injury to Donatelle's property, real or personal. See Brandt v. Hallwood Mgmt. Co., 560 N.W.2d 396, 399 (Minn. Ct. App. 1997).

The parties do not dispute that Donatelle has asserted claims that seek damages for an injury to real or personal property caused by the condition of the flooring. Nor is there any dispute that StonCor furnished materials for and either installed or supervised the

installation of the improvement at issue -- the epoxy resin flooring. The element at issue on summary judgment is whether the flooring is "defective and unsafe," as that phrase has been construed for section 541.051. In opposition to summary judgment, Donatelle argues that the flooring is not "defective and unsafe" and, furthermore, contends that the fraud exception in subdivision 1(a) and the exception in subdivision 4 for actions based on a breach of express written warranty apply. The Court begins with whether the floor constitutes a "defective and unsafe condition."

### A. "Defective and Unsafe Condition"

StonCor contends that the cracked, delaminating, peeling, and non-adhering flooring in the Donatelle facility is a "defective and unsafe condition" within the meaning of section 541.051. For this argument, StonCor relies principally on the Minnesota Supreme Court's 1992 decision in Griebel v. Andersen Corporation, 489 N.W.2d 521 (Minn. 1992), in which the court specifically construed that statutory phrase. In that case, the Griebels had built a house on property on Lake Superior, insisting on the use of Andersen doors and windows in the construction specifications. 489 N.W.2d at 521. After moving into the house, they discovered what was to become a continual problem: the accumulation of hundreds of dead flies that were apparently entering the house through or around the patio door. Id. at 522. Almost two years later, in the spring of 1988, the general contractor tried to correct the problem. Id. That fall, however, the Griebels again found collections of dead flies near the doors and throughout the

basement. Id. Therefore, in November 1989, they sued Andersen and the distributor from whom the general contractor had purchased the doors, seeking damages for the cost of replacing the allegedly defective patio doors and for diminution of the market value of the home. Id.

Considering the application of the limitations period in section 541.051 to the Griebels' lawsuit, the Minnesota Supreme Court framed the issue presented as "whether the alleged injury to the property arises out of a 'defective and unsafe' condition." Id. Turning to earlier cases applying section 541.051, the majority observed that the Minnesota Supreme Court has "**used the phrase as a collective, with its individual terms often interchanged** depending upon the facts or circumstances in which the statute has been invoked." Id. at 523 (emphasis added). It then rephrased the issue presented as "whether injury to property or bodily injury or wrongful death arises out of a 'defective **or** unsafe condition.'" Id. (emphasis added).

The majority next considered the court of appeals' reasoning that the term "unsafe" was limited in meaning to "articles that are hazardous to physical well-being." Id. Rejecting that analysis as unduly restrictive, the majority held that "'unsafe' can also mean 'insecure.'" Id. Reasoning that "one of the primary purposes of windows and doors is security against unwanted intruders of any kind," id., the majority determined that a window or door that does not "provide the expected barrier against unwanted elements such as rain or snow or living creatures such as flies or mosquitoes is insecure or

unsafe whether or not the invader is hazardous to life and limb." Id. The majority in Griebel concluded that a restrictive definition of the term "unsafe" would create the "absurd result" of imposing a two-year limitations period on claims where "the offending improvement is not only defective but in addition presents a risk of bodily injury" while allowing a longer, six-year limitations period for claims where "the improvement is merely defective and presents no risk of bodily harm." Id. Therefore, the Minnesota Supreme Court stated that it would recognize "**alternative definitions** of 'unsafe' **such as** 'insecure.'" Id. (emphasis added.)

In opposing summary judgment, Donatelle argues that the flooring's condition is neither unsafe (i.e., it poses no hazard to physical safety) nor insecure. There are roughly six areas in the space in which StonCor installed the epoxy flooring where the concrete substrate is now exposed. (Donatelle Aff. ¶ 82.) In one such area, Donatelle has put down some tape to keep the flooring in place and prevent further separation of the epoxy flooring from the concrete. (Id.) There is also cracking and slight uplifting of the flooring around numerous joint areas. (Id.) Where the flooring has totally separated from the concrete substrate, there is a very slight edge – no more than one-sixteenth of an inch – between the substrate and the remaining epoxy flooring. (Id. ¶ 80.) Donatelle asserts that the edge presents no danger of tripping; furthermore, StonCor has never cautioned Donatelle that there is a risk of injury to people as a result of the slight edge. (Id. ¶ 81.) Finally, Donatelle argues that the defective floor in no way renders the property

"insecure" because nothing that is intended to be kept out – such as rain, snow, insects or other living creatures – can enter the premises as a result of the defective floor. (Id. ¶ 83.)

There is no genuine issue of material fact as to whether the faulty flooring is either hazardous or "insecure" – it is neither. Simply put, the flooring looks bad. Such a determination does not, however, resolve whether the limitations period of section 541.051 applies. Griebel held that the phrase "defective and unsafe" is used in section 541.051 "as a collective, with its individual terms often interchanged." Thus, the issue decided in Griebel was whether the injury to property arose out of "a 'defective **or** unsafe condition.'" Griebel, 489 N.W.2d at 522. Although the undersigned has previously read Griebel as "emphasiz[ing] that the . . . phrase is stated in the conjunctive, not the disjunctive," see Appletree Square I Ltd. P'ship v. W.R. Grace & Co., 815 F. Supp. 1266, 1273 (D. Minn. 1993) (Kyle, J.), that assessment must be revisited. The Minnesota Supreme Court is not consistent in its language in the Griebel decision. In places it uses the phrase "defective **and** unsafe" and in others uses the phrase "defective **or** unsafe." Both the majority's opinion and the dissent make clear, however, that the majority construed the statutory phrase "defective and unsafe" in such a way that the terms "defective" and "unsafe" are interchangeable and the term "unsafe" has the broadest possible reading.[5] See id. at 523-24 (Tomljanovich, J., dissenting) (criticizing the

---

[5] The undersigned has previously noted that,

In Fiveland v. Bollig & Sons, Inc., 436 N.W.2d 478 (Minn. Ct. App. 1989), the

majority for "ignor[ing] the clear command of the statute that in order for the two-year limitations period to apply, the injury must arise out of a condition which is both defective and unsafe" and stating that the majority has stretched the definition of "unsafe" so that it will include merely defective improvements).

The majority in Griebel construed section 541.051 out of a concern that it would be "absurd" to provide a longer limitation period for a claim arising out of a defect in an improvement to real property that presented no risk of bodily harm than for a claim arising out of a defect which has caused bodily harm. Following Griebel, the Minnesota Court of Appeals held that windows which were designed to be opaque but lost their opacity because the opacifying layer peeled away were also "insecure" or unsafe within the meaning of the statute. They allowed light to penetrate and illuminate what was meant to be concealed. Metropolitan Life Ins. Co. v. M.A. Mortenson Cos., 545 N.W.2d 394, 397, 399-400 (Minn. Ct. App. 1996).

The undersigned has reservations about whether Griebel essentially amended the language of section 541.051 to read "defective **or** unsafe." Regardless of those concerns,

---

court applied a "common sense" definition of "defective" for purposes of Minn. Stat. § 541.051, subd. 1(a). Looking to the dictionary, the court held that an improvement to real property is "defective" if it contains an "imperfection or fault" or is otherwise "incomplete." Id. at 480.

Appletree Square 1 Ltd. P'ship v. W.R. Grace & Co., 815 F. Supp. 1266, 1273 n.12 (D. Minn. 1994) (Kyle, J.)

however, "[a] federal district court sitting in diversity must apply the rules of state law which it believes the state's own courts would apply." Nesladek v. Ford Motor Co., 876 F. Supp. 1061, 1065 (D. Minn. 1994) (Kyle, J.) (citation omitted); see also Donovan v. Harrah's Maryland Heights Corp., 289 F.3d 527, 529 (8th Cir. 2002) (a federal court sitting in diversity jurisdiction applies the law that the forum state would apply). The Court believes that Minnesota courts would apply Griebel, the most recent Minnesota Supreme Court decision to construe the phrase "defective and unsafe" in section 541.051, to the facts of this case.

The record establishes that the flooring product StonCor manufactured and installed at Donatelle's plant is an improvement to real property that is defective: it has cracked, discolored, peeled, delaminated, and become detached from the concrete substrate below. The defective condition of the flooring has caused Donatelle to suffer injury to its property. In light of Griebel, this Court must conclude that the two-year statute of limitations applies to the claims brought by Donatelle to the extent those claims seek damages for an injury to property, real or personal, arising from the defective condition of the flooring. The Court now turns to the two exceptions found in section 541.051: the exception for claims based on a breach of an express written warranty and the exception "where fraud is involved."

**B. Breach of an Express Written Warranty**

Section 541.051, quoted above, does not apply to claims based upon breach of an

express written warranty. Appletree Square I Ltd. P'ship v. W.R. Grace & Co., 29 F.3d 1283, 1284 (8th Cir. 1994). An action for breach of warranty must be brought, however, within two years of discovery of the breach. Minn. Stat. § 5451.051, subd. 4.

In the September 11 bid letter, StonCor expressly warranted that it would "provide a single source five (5) year warranty covering all labor and materials," and includes

- Adhesion of the flooring system to the concrete substrate.
- Integrity of the system – blistering, delamination, or peeling.
- Cracking of the flooring system at control joints.
- Chemical resistance per the product data provided.
- Temperature stability per the product data provided.

(Powell Aff. Ex. 9 at DPI00016.) StonCor argues that this language constitutes a "repair and replace" warranty and, therefore, the breach would have been discovered -- for purposes of subdivision 4 of section 541.051 -- no later than the first time Donatelle noticed that the floor was defective, weeks after its installation in January 1999. Donatelle contends that StonCor's warranty language constitutes a "warranty of future performance." Therefore, breach of such a warranty occurred when StonCor stopped trying to make the flooring perform as warranted and tried to sell Donatelle a new floor in the fall of 1999.

The Minnesota Court of Appeals has explained the difference between a warranty of future performance and a "repair or replacement" warranty as follows:

> A warranty of future performance of a product must expressly provide some form of guarantee that the product will perform in the future as promised. * * *

> On the other hand, a repair or replacement warranty does not warrant how the goods will perform in the future. Rather, such a warranty simply provides that if a product fails or becomes defective, the seller will replace or repair within a stated period.
>
> Thus, the key distinction between these two kinds of warranties is that a repair or replacement warranty merely provides a remedy if the product becomes defective, while a warranty for future performance guarantees the performance of the product itself for a stated period of time. In the former case, the buyer is relying upon the warranty merely as a method by which a defective product can be remedied which has no effect upon his ability to discover a breach. In the latter instance, the buyer is relying upon the warranty as a guarantee of future performance and therefore has no opportunity to discover the breach until the future performance has been tested.

Anderson v. Crestliner, Inc., 564 N.W.2d 218, 222 (Minn. Ct. App. 1997) (internal citations and quotation marks omitted). Generally, a cause of action for breach of warranty accrues at the time tender of delivery is made, regardless of the aggrieved party's lack of knowledge of the breach. Minn. Stat. § 336.2-725(2). Where a warranty explicitly extends to the future performance of the goods, however, "the cause of action accrues and the statute of limitations begins to run when the plaintiff discovers or should have discovered the defendant's refusal or inability to maintain the goods as warranted in the contract." Church of the Nativity v. WatPro, Inc., 491 N.W.2d 1, 6 (Minn. 1992), overruled on other grounds by Ly v. Nystrom, 615 N.W.2d 302 (Minn. 2000); M.A. Mortenson Cos., 545 N.W.2d at 400.

The Court has analyzed the warranty language quoted above and concludes that it is unambiguously a warranty of future performance. The five-year warranty specifically applies to the "adhesion" of the flooring to the substrate, its "integrity," its "chemical

resistance" and its "temperature stability." These are aspects of the floor's performance, and are warranted for a period of five years. The Court finds StonCor's warranty to be comparable to the warranty in WatPro, where the manufacturer promised to maintain the roof in a watertight condition for ten years. The Supreme Court held that such language "extended to the future performance of the goods, expressly warranting that the roofs would remain watertight for ten years." WatPro, 491 N.W.2d at 6; see also Crestliner, 564 N.W.2d at 221. The reference in StonCor's warranty to materials and labor is entirely consistent with and reflects the scope of StonCor's bid to Donatelle: it bid to manufacture and install the flooring system as a "single source." Compare Crestliner, 564 N.W.2d at 221 (holding that a warranty made to the first purchaser at retail that the new boat would be free from any defect in material or workmanship of the hull and deck structure for 5 years was a warranty of future performance).

From the record before it, the Court determines that there is no genuine issue of material fact as to when Donatelle discovered or should have discovered StonCor's refusal or inability to maintain the goods as warranted. StonCor last made repairs to the floor in September 1999 and tried to sell Donatelle a new floor later that fall. Donatelle brought suit in July 2001, less than two years after StonCor made its last attempts to maintain the integrity of the flooring and the flooring's adhesion to the concrete substrate. The Court therefore concludes that Donatelle's cause of action based on breach of an express written warranty, Count One of the Amended Complaint, falls within the

exception of subdivision 4 to section 541.051.

**C. "Except Where Fraud is Involved"**

Donatelle relies on the opening clause of subdivision 1(a) -- "[e]xcept where fraud is involved" -- to argue that its common law and statutory fraud claims are not subject to the limitations period in section 541.051. StonCor contends that the opening clause applies only to fraud that prevents a plaintiff from discovering an actionable injury, not to general allegations of fraud.

Minnesota courts have consistently held that exception to subdivision 1(a) of section 541.051 "where fraud is involved" applies "if the defendant has by fraud prevented the plaintiff from discovering the defective and unsafe condition within [the repose period]." Metropolitan Federal Bank of Iowa, F.S.B. v. W.R. Grace & Co., 999 F.2d 1257, 1261 (8th Cir. 1993) (quoting Wittmer v. Ruegemer, 419 N.W.2d 493, 497 (Minn. 1988)). The repose period is presently ten years. Minn. Stat. § 541.051, subd. 1(a). Under those circumstances, "the statute is tolled until the plaintiff could, by reasonable diligence, have discovered the defective condition." Id.

The relationship of the "where fraud is involved" exception to the two-year limitations period in section 541.051 is less clear. Prior to 1988, the statute was construed to mean that it was the discovery of the defective and unsafe condition that set the two-year limitations clock in motion. Wittmer v. Ruegemer, 419 N.W.2d at 496. Based on that reading, the Minnesota Supreme Court held that "fraud does not toll the [two-year

limitation period of the] statute because the limitation period does not, according to its terms, begin to run until discovery of the defective condition." Id. at 498. In apparent response to Wittmer, in April 1988, the Minnesota Legislature amended subdivision 1(a) of section 541.051 so that discovery of the injury started the running of the limitations clock, not discovery of the defective and unsafe condition. City of Willmar v. Short-Elliott-Hendrickson, Inc., 475 N.W.2d 73, 76 (Minn. 1991) ("Despite language indicating that the 1988 amendment was merely a 'clarification,' it effectively overruled Wittmer by establishing the discovery of an injury, rather than a defective condition, as the point at which the limitation period begins to run.").

While the Minnesota Supreme Court has not addressed whether the 1988 amendment impacts its reasoning in Wittmer, the court of appeals has concluded that it does not, holding that fraud is relevant to the operation of the two-year limitations period only insofar as it prevents a plaintiff from learning of its injury. Dakota County v. BWBR Architects, Inc., 645 N.W.2d 487, 494 (Minn. Ct. App. 2002). "Once [the plaintiff] discovered an actionable injury, fraudulent concealment no longer tolled the statute of limitations." Id.; accord Mutual Serv. Life Ins. Co. v. Galaxy Builders, Inc., 435 N.W.2d 136, 140 (Minn. Ct. App. 1989) (construing the "[e]xcept where fraud is involved" language to pertain to discovery of the underlying cause of action, not the legal basis for the cause of action itself.) The Court concludes that the 1988 amendment to section 541.051 has no significant impact on the operation of the "[e]xcept where fraud is

involved" language of subdivision 1(a).

That conclusion is consistent with this Court's analysis in Appletree Square 1 Limited Partnership, in which the plaintiff had asserted nine state law claims, including claims for fraud, misrepresentation, and violations of Minnesota's false advertising and consumer fraud statutes. The defendant, W.R. Grace, moved for summary judgment on all of the state law claims on the ground that they were barred by section 541.051. This Court concluded that the language regarding a cause of action "in contract, tort, or otherwise" was broad enough to encompass all of the state law causes of action; it therefore dismissed Appletree Square's state statutory claims for false advertising and consumer fraud, as well as its common law claims for fraud and misrepresentation.[6]

Donatelle argues that, at a minimum, it should be allowed to proceed on its claim for fraudulent concealment, Count Twelve of the Amended Complaint; it contends that StonCor fraudulently maintained until late 1999 that it had done nothing wrong and that the only problem with the floor was attributable to the control joints not having been saw cut after installation of the epoxy floor. (Pl.'s Mem. Opp'n to Mot. for Summ. J. at 8.)

---

[6] Appletree Square argued specifically that section 541.051 did not apply "to Count III of the Complaint, which states a cause of action for nuisance, nor to that portion of Count II alleging negligence based upon a breach of a duty to warn." Appletree Square 1 Ltd. P'ship, 815 F. Supp. at 1273. The Court disposed of those arguments and held that, based on the two-year statute of limitations in Minn. Stat. § 541.051, subd. 1(a), the defendant was entitled to summary judgment on all of Appletree Square's state law claims, except for the breach of warranty claims. Id. at 1274, 1280. Appletree Square made no specific arguments regarding the common law or statutory fraud/ misrepresentation claims.

Donatelle further complains that StonCor never disclosed that it had failed to test for the presence of excess moisture or that the Stonshield SLT system was destined to fail because of the absence of a vapor barrier. (Id. at 9.) Thus, it was not until late 1999 that StonCor admitted that the problem was not isolated but rather was widespread because of excess moisture being transmitted through the concrete substrate. (Id.)

The facts presented in support of Donatelle's fraudulent concealment claim do not establish a genuine issue of material fact as to whether StonCor fraudulently concealed information necessary to Donatelle's discovery of its cause of action. Discovery of the defective condition cannot be equated to discovery of injury to property. As established by Donatelle's own affidavits and answers to interrogatories, Donatelle knew -- as of July 1, 1999 -- that (1) the floor in the Tool Room was delaminating next to a wall; (2) there were problems with the flooring at the joints in the Tool Room; and (3) the flooring was cracking and delaminating around the joints in the injection molding production room. Donatelle complained to StonCor about all of these problems. Insofar as these problems with the flooring directly conflicted with Donatelle's desire to have a smooth, seamless floor in its production area, they negatively impacted the value of the new facility. Thus, more than two years prior to bringing suit against StonCor, Donatelle had discovered an injury to its property. There is no factual basis for tolling the two-year limitations period.

Based on the foregoing, the Court concludes that Donatelle's common law claims for fraud and misrepresentation, and fraudulent concealment, and its statutory claims for

misrepresentation, are subject to and barred by the two-year limitation period of section 541.051.[7]

**D. Conclusion**

Based on the foregoing, the Court concludes that Minn. Stat. § 541.051 bars Count Two (Breach of Implied Warranty of Merchantability), Count Three (Breach of Implied Warranty of Fitness for a Particular Purpose), Count Four (Breach of Contract), Count Five (Breach of Guarantee), Count Six (Strict Product Liability), Count Seven (Negligence), Count Eight (Fraud and Misrepresentation), Count Nine (Deceptive Trade Practices), Count Ten (False Statements in Advertising), Count Eleven (Consumer Fraud/Unlawful Practices) and Count Twelve (Fraudulent Concealment) of the Amended Complaint.[8] Those counts shall be dismissed with prejudice. Donatelle's claim for

---

[7] To the extent the applicable statute of limitations for Donatelle's statutory claims arguably could be section 541.05 of the Minnesota Statutes, which provides a six-year limitations period for actions "upon a liability created by statute," Minn. Stat. § 541.05, subd. 1(2); Klehr v. A.O. Smith Corp., 875 F. Supp. 1342, 1352 (D. Minn. 1995) (Davis, J.); Estate of Riedel by Mirick v. Life Care Retirement Communities, Inc., 505 N.W.2d 78, 83 (Minn. Ct. App. 1993), the more general provision of section 541.05 must yield to the more recent and more specific provision of section 541.051. Fagerlie v. City of Willmar, 435 N.W.2d 641, 644 (Minn. Ct. App. 1989) (holding that statutory nuisance claim is subject to two-year limitations period of section 541.051, not the general six-year period of section 541.05, subd. 1(2)); see also Patton v. Yarrington, 472 N.W.2d 157, 160-61 (Minn. Ct. App. 1991); Ford v. Emerson Electric Co., 430 N.W.2d 198 (Minn. Ct. App.1988).

[8] Because the Court has dismissed Donatelle's negligence and strict liability claims as time-barred, it is unnecessary to reach StonCor's argument that recovery under those claims is barred by the economic loss doctrine. Similarly, because the Court has dismissed Donatelle's common law and statutory fraud claims, the Court need not address

breach of express written warranty is not time-barred.

## III. Limitation on Damages

StonCor also moves to preclude Donatelle from recovering approximately $380,000 in lost profits and approximately $100,000 for such things as "keeping Donatelle's operations 'environmentally clean' during a repair, moving equipment and related electrical work." (Def.'s Mem. Supp. Mot. for Summ. J. at 33-34.) StonCor advances two arguments opposing Donatelle's recovery of such damages: (1) the parties' contract precludes any recovery for consequential or incidental damages, and (2) Donatelle's claims for lost profits are remote and speculative.

### A. Contractual Limitation of Liability

StonCor argues that the parties agreed to limit the damages Donatelle may recover from StonCor, relying on paragraph 4 of the General Terms and Conditions attached to StonCor's September 11 bid letter. That paragraph provides:

> The parties acknowledge that in the event repairs need to be performed to the contract work, Stonhard's liability shall be limited to furnishing the labor and the materials necessary to reinstall the defective areas. Unless otherwise agreed in writing signed by an authorized agent of Stonhard, Stonhard's obligation to furnish the labor and material necessary to reinstall the defective areas shall terminate one (1) year after the completion of the original contract work. Stonhard shall not be liable for damages to the contract work resulting from ordinary wear and tear, gouging, impact, failure of the Customer to protect the work as outlined in Section 2.f., the occurrence of reverse impact or the effects of osmotic or hydrostatic pressure or moisture vapor transmission. ***The parties further acknowledge that Stonhard shall not be***

---

the merits of those claims.

> ***responsible for any consequential or incidental damages resulting from any breach of warranty.***

(C. Donatelle Aff. Ex. 4 (cmphasis added).) StonCor argues that this limitation on damages is enforceable under Article 2 of the Uniform Commercial Code. Thus, before addressing whether the Limitation of Liability is enforceable against Donatelle, the Court must first decide whether the transaction between StonCor and Donatelle is a sale of goods transaction, governed by Article 2 of the U.C.C.[9]

The parties do not dispute that the transaction at issue is a hybrid, involving both goods and services. "Minnesota courts use the 'predominant purpose' test to determine whether Article 2 applies to such a contract or transaction." AKA Distrib. Co. v. Whirlpool Corp., 137 F.3d 1083, 1085 (8th Cir. 1998) (citing Vesta State Bank v. Independent State Bank, 518 N.W.2d 850, 854 (Minn. 1994)). "The test [for hybrid contracts involving goods and services is] whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved (e.g., contract with artist for painting) or is a transaction of sale, with labor incidentally involved (e.g., installation of a water heater in a bathroom)." Bonebrake v.

[9] Article 2 of the Minnesota Uniform Commercial Code applies to "transactions in goods." Minn. Stat. § 336.2-102. The parties briefed whether their contract was within the scope of Article 2 of the U.C.C. in the context of whether the economic loss doctrine applied to Donatelle's negligence and strict liability claims. The nature of the contract is also relevant, however, to the limitations on damages arguments because the U.C.C. has specific provisions defining a buyer's consequential and incidental damages and the parties' ability to limit or alter the measure of damages. See Minn. Stat. §§ 336.2-715 and 336.2-719(1) & (3).

Cox, 499 F.2d 951, 960 (8th Cir. 1974); accord Valley Farmers' Elevator v. Lindsay Bros. Co., 398 N.W.2d 553 (Minn. 1987), overruled on other grounds by Hapka v. Paquin Farms, 458 N.W.2d 683 (Minn. 1990). "[I]f the predominant purpose of the contract is the sale of goods, then the U.C.C. governs; if the predominant purpose of the contract is the rendition of services, then the U.C.C. does not govern." McCarthy Well Co., Inc. v. St. Peter Creamery, Inc., 410 N.W.2d 312, 315 (Minn. 1987). "The question as to the classification of a hybrid contract is generally one of law." Valley Farmers' Elevator, 398 N.W.2d at 556.

StonCor argues that the services associated with installation of the Stonshield SLT resinous flooring were merely incidental to the sale of the flooring itself. No separate charges for labor were estimated in the September 11 bid letter, nor was Donatelle asked to pay itemized charges for services rendered. StonCor submitted an affidavit from Rick Neill, Vice President of Sales, indicating that the cost of the labor for installing the flooring at Donatelle's facility was $27,100. (Neill Aff. ¶ 3.) Given that Donatelle contracted for flooring for 27,100 square feet of the new facility, the labor costs for installing the flooring were $1.00 per square foot. Jim Wafford, StonCor's regional sales manager for a multi-state region including Minnesota, testified that the Stonshield SLT flooring system lists for approximately $2.00 per square foot and the materials cost approximately $1.40 per square foot. (McMahon Aff. Ex. 7 at 127.) StonCor quoted Donatelle a price of $2.90 per square foot in its September 11 bid letter. From the

foregoing, therefore, approximately 33% of the amount billed to Donatelle for the flooring system was for labor and approximately 50% was for materials.

StonCor's bid proposal describes the transaction with Donatelle as a "project." (Powell Aff. Ex. 7 (Sept. 11, 1998 letter from Schaller to Phillipsen).) Included in the proposal book was a "project management plan" describing StonCor as offering a "turn-key solution." StonCor's proposal to manage the project for the Donatelle Plastics facility was presented in three parts: The Project Management Team, The Installation Crew, and Critical Project Activities. The three "critical project activities" were planning, installation (further subdivided into set-up, preparation, and application), and quality.

In its proposal book, StonCor references, more than once, the fact that it has "over 350 Project Engineers worldwide" and "over 175 specially trained installation teams," and is a

> Manufacturer and installer of customized polymer:
> Floor & Wall Systems
> Coating & Lining Systems
> Construction Products

(Id.) Under the heading "Manufacture and Install Systems," StonCor stated that it would provide "pre-installation planning," "system installation with experienced crew," "on-site engineer supervision," and "post-installation inspection." The section of the proposal book entitled "Pricing" consists of the September 11 bid letter that is quoted at length in the Background section, supra. The section of the bid letter captioned "Scope of Work,"

details eight stages of installation associated with the application of the resinous flooring system at Donatelle.

Considering the foregoing, the Court concludes that StonCor was not contracting for the epoxy resinous flooring materials alone -- StonCor was bidding to perform part of the larger "project" of building the new facility. See Ranger Constr. Co. v. Dixie Floor Co., Inc., 433 F. Supp. 442, 445 (D.S.C. 1977). Holding itself out as a "sole source" supplier, providing both materials and labor, StonCor bid for and won the contract to provide the flooring for approximately one-third of Donatelle's new facility. The proposal identifies several services that span the entire process of constructing the floor. Cf. Matthews v. Metropolitan Contract Carpets, Civ. A. No. 88-0935, 1988 WL 124900, *2-3 (E.D. Pa. Nov. 23, 1988) (holding that contracts for the installation of a parquet floor and for refinishing the floor were predominantly service contracts). The services provided by StonCor are significant and go beyond simply transforming raw materials into a useable product. Compare Valley Farmers' Elevator, 398 N.W.2d at 556 ("Services are always required to convert raw material into a useful product."). The StonCor contract is readily distinguishable from a contract for "the installation of a water heater." Bonebrake, 499 F.2d at 959. The predominant purpose of the StonCor contract was to provide services; it therefore is not within the scope of Article 2 of the U.C.C.

Donatelle argues that it never agreed to the limitation of liability found in the General Terms and Conditions. Donatelle disputes StonCor's assertion that the contract

between the parties is found in only four pages of the proposal book StonCor sent to Donatelle on September 11, 1998. Donatelle further contends that the Limitation of Liability is contrary to other representations made by StonCor in connection with its bid proposal, including representations that StonCor would not rely on fine print to avoid contractual obligations. The Court concludes that there are genuine issues of material fact as to whether the Limitation of Liability is a binding and enforceable provision of the parties' contract.[10] Accordingly, summary judgment is not appropriate.

## B. Recovery of Lost Profits or Business Interruption Expense

StonCor argues that Donatelle's alleged "lost profits" or "business interruption expense" damages are too speculative to be allowed before the jury. Donatelle responds that it has presented evidence of past and future profitability that is adequate to permit Donatelle to predict the effect of shutting down operations to repair the floor in the production areas of the facility. Specifically, Donatelle argues that it is operating at full capacity now; a business interruption will interfere with its capacity to produce products both for immediate shipment and products to be held in inventory to meet customer demand.

"The general rule in Minnesota is that damages in the form of lost profits may be recovered where they are shown to be the natural and probable consequences of the act or

---

[10] The parties are directed to address in their trial briefs the choice of law issue presented by Paragraph 6 of the General Terms and Conditions

omission complained of and their amount is shown with a reasonable degree of certainty and exactness." Cardinal Consulting Co. v. Circo Resorts, Inc., 297 N.W.2d 260, 266 (Minn. 1980) "[T]he nature of the business or venture upon which the anticipated profits are claimed must be such as to support an inference of definite profits grounded upon a reasonably sure basis of facts," yet absolute certainty is not required. Id. Viewing the record in the light most favorable to Donatelle, the Court concludes that StonCor has failed to establish that Donatelle's claimed business interruption damages are so speculative or remote that they fail as a matter of law. StonCor's motion to exclude evidence of such damages will be denied.

**Conclusion**

Based on the foregoing, and all of the files, records and proceedings herein, **IT IS ORDERED** that Defendant Stonhard, Inc.'s Motion for Summary Judgment (Doc. No. 37) is **GRANTED IN PART** as follows: Counts Two, Three, Four, Five, Six, Seven, Eight, Nine, Ten, Eleven and Twelve of the Amended Complaint are **DISMISSED WITH PREJUDICE** as barred by the two-year limitations period of Minn. Stat. § 541.051, subd. 1(a). With respect to Count One, the Motion is **DENIED**.

Dated: September 5, 2002

RICHARD H. KYLE
United States District Judge